1996 SD 140

STATE of South Dakota, Plaintiff
and Appellee,

v.

Ralph Dean PETERSON, Defendant
and Appellant.

No. 19511.

Supreme Court of South Dakota.

Considered on Briefs Oct. 23, 1996.

Decided Dec. 4, 1996.

Mark Barnett, Attorney General, Wade A. Hubbard, Deputy Attorney General, Pierre, for plaintiff and appellee.

Michael W. Hanson, Sioux Falls, for defendant and appellant.

SABERS, Justice

[¶ 1.] Peterson was convicted of rape and attempted rape of his two minor daughters. He claims that certain out-of-court statements made by one daughter were improperly admitted. He was sentenced to two terms of life imprisonment to be served concurrently with sentences of 100 years and 25 years. He also argues his sentence is excessive and constitutes cruel and unusual punishment. We affirm.

## FACTS

[¶ 2.] Ralph Peterson (Peterson) and his former wife, Cheryl Ann Peterson (Cheryl), were indicted in 1993 by a Minnehaha County grand jury on various charges of child sexual abuse. Four of the counts were directed at Peterson, all involving attempted rape and rape of their minor daughters, A.R.P., then six years of age, and A.L.P., then age three. In Peterson's first trial, the jury found him guilty on all four counts and Circuit Court Judge Srstka sentenced him to life imprisonment with 165 years to be served concurrently and another 320 years to be served consecutively.

[¶ 3.] Peterson appealed. This court agreed that Judge Srstka should have recused himself and the case was remanded for a new trial. *See State v. Peterson*, 531 N.W.2d 581 (S.D.1995). In August of 1995, a second trial was held, presided over by Circuit Court Judge Severson.

[¶ 4.] Prior to the trial, State moved to allow hearsay statements made by the children to a social worker and a police officer.[1] At the motion hearing, the trial court decided A.R.P., then eight years of age, was competent to testify. The court ruled her hearsay statements were sufficiently reliable and therefore admissible as corroboration to her testimony, but only after she testified.

[¶ 5.] At trial, Coreen Carroll (Carroll), a social worker with the Department of Social Services who interviewed A.R.P. on two occasions, was allowed to testify to statements made by her concerning sexual abuse by Peterson. Carroll testified that A.R.P. told her that her father: Fondled and licked her chest area; penetrated her vagina with his finger, which "really hurt"; performed oral sex on her; touched and put Vaseline on her anal area; and that once he tried to penetrate her vagina with his penis, but she was "too small." She also described an incident to Carroll where Cheryl took A.R.P.'s hand and placed it on Peterson's penis, and then moved it in an up and down motion. Another time, A.R.P. told her, she lay face down on the couch, while her father kneeled behind

her with his penis on her back until "water" covered her back.

[¶ 6.] On the second day of trial, the jury found Peterson guilty of two counts of first degree rape of A.R.P., one count of attempted first degree rape of A.R.P., and one count of first degree rape of A.L.P. Peterson appeals.

[¶ 7.] **1. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING THE OUT-OF-COURT STATEMENTS.**

[¶ 8.] Peterson claims A.R.P.'s out-of-court statements were unreliable and inconsistent and should not have been admitted into evidence. Our standard of review of evidentiary rulings is well established:

> For us to disturb the evidentiary rulings of the circuit court, we must determine that an abuse of discretion has occurred. Once again, an abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.

*State v. Buller*, 484 N.W.2d 883, 885(SD), *cert. denied*, 506 U.S. 887, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992) (citations omitted).

▪ [¶ 9.] Out-of-court statements made by a minor victim of sexual abuse are admissible under SDCL 19–16–38, which provides, in relevant part:

> A statement made by a child under the age of ten ... describing any act of sexual contact or rape performed with or on the child by another ... not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant ... in the courts of this state if:
>
>> (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
>>
>> (2) The child either:
>>
>>> (a) Testifies at the proceedings; or

---

1. State eventually withdrew the portion of the motion which related to statements made by the younger daughter, A.L.P.

(b) Is unavailable as a witness.

The factors to be considered in deciding whether these statements are sufficiently reliable under SDCL 19–6–38 are:

> The age and maturity of the child, the nature and duration of the abuse, the relationship of the child to the offender, the consistency of repetition and the reliability of the assertions, and the reliability of the child witness.

*Buller*, 484 N.W.2d at 886; *State v. Floody*, 481 N.W.2d 242, 251 (S.D.1992); *State v. Thompson*, 379 N.W.2d 295, 297 (S.D.1985). Peterson does not claim the trial court conducted the hearing in an improper manner, nor he does assert the court overlooked any of the factors in determining reliability.

[¶ 10.] "The determination of reliability must be made prior to the admission of the hearsay." *Buller*, 484 N.W.2d at 886 (citation omitted). The evidence which was available to the court at the motion hearing supports the court's finding A.R.P.'s out-of-court statements were sufficiently reliable. Carroll testified to what A.R.P. told her in their two interviews. A.R.P. was questioned by the State and defense counsel, as well as the judge. It was clear she knew the difference between the truth and lies, and she consistently reported all she had been instructed to tell was the truth. The trial court found she passed the threshold test of *State v. Phipps*, 318 N.W.2d 128, 130 (S.D. 1982) ("In order to be a competent witness, a child must have 'sufficient mental capacity to observe, recollect, and communicate, and some sense of moral responsibility . . . .' ") (citation omitted).

[¶ 11.] At the motion hearing and in this appeal, Peterson argues her out-of-court statements were unreliable because, while she reported the abuse suffered at his hands, she omitted her mother's involvement. He points out that she did not tell Carroll at their first interview that Cheryl also abused her, or that A.R.P. ever touched Peterson's penis. Cheryl was present at the first meeting because A.R.P. was reluctant to leave her presence. During the second interview, which Cheryl did not attend, A.R.P. *did* tell Carroll about her mother's involvement, including the incident when Cheryl placed A.R.P.'s hand on Peterson's penis. At trial, she testified Peterson "told me to touch his front private and go up and down." Carroll testified it was not unusual for a child to avoid implication of a parent who is within earshot: "Sometimes children don't always want to admit or be honest about everything when a parent [is] present."

[¶ 12.] Peterson also argues her statements lacked sufficient indicia of reliability because at trial she stated she did not remember speaking to Carroll. Two years passed between their interviews and the trial; it is not surprising that an eight-year-old does not remember speaking to a person she met briefly on two occasions two years earlier. Carroll also investigated possible abuse in the Peterson household at an earlier date and A.R.P. did not remember Carroll from that meeting either.

[¶ 13.] At trial, A.R.P. responded, "I don't remember that" when asked, "[D]id you tell people that [Peterson] put his finger in you and went back and forth real hard?" This testimony, Peterson claims, is inconsistent with the statements Carroll attributes to her. The fact that she did not recite verbatim the language she used in an interview she no longer remembers is somewhat irrelevant. She testified on cross-examination what Peterson did to her was painful: "When I'd use the bathroom, I think why it hurt, because probably he put [Vaseline] in it, too much [Vaseline] in."

[¶ 14.] Peterson claims her statements were inconsistent whether he inserted his finger partially or completely into her vagina. Dr. Willman, who examined A.R.P. and testified at trial, stated that a six-year-old child neither could nor would fully comprehend any particular degree of vaginal penetration. We also note that the degree of penetration is irrelevant to his rape convictions. *See* SDCL 22–22–2 (defining sexual penetration, in part, as "any intrusion, however slight").

[¶ 15.] Peterson also complains A.R.P.'s testimony is unreliable because she was instructed by Cheryl to lie or omit facts. However, during the first interview with Carroll, A.R.P. turned to her mother and asked

if she would be in trouble for telling—Cheryl replied, "No." Furthermore, she testified at trial that Cheryl had not told her to deny her role in the abuse. Even if she was told to lie, the consistency with which she told, and retold, the nightmare which was her life indicates she could not or would not follow those instructions. As the State puts it, Peterson is "searching for unreliability in a fountain of truth."

[¶ 16.] The picture which emerges from the version related by Carroll essentially mirrors the one A.R.P. told in her own words from the witness stand. The fact that A.R.P. no longer remembered Carroll or the precise words she used when she spoke to her may strengthen her reliability because her account *did not change.*

[¶ 17.] It has not been shown that the trial court abused its discretion in admitting A.R.P.'s out-of-court statements. *Buller,* 484 N.W.2d at 887 (citing *Floody,* 481 N.W.2d at 252).

[¶ 18.] 2. **WHETHER THE SENTENCE IS EXCESSIVE AND AMOUNTS TO CRUEL AND UNUSUAL PUNISHMENT.**

[¶ 19.] Peterson claims his sentence is excessive, disproportionate to his crimes, that it shocks the conscience, and constitutes cruel and unusual punishment under both the South Dakota and the United States Constitutions. *See* U.S. Const. amend. VIII (forbidding the infliction of cruel and unusual punishment); S.D. Const. art. VI, § 23 (prohibiting cruel punishment in similar language).

> Generally, the state and federal constitutional provisions barring cruel and unusual punishments refer to the character, such as barbaric penalties involving physical torture, rather than the duration of punishment. Although punishment by imprisonment is not per se cruel and unusual it may be constitutionally offensive when the

duration of the sentence prescribed is so excessive or disproportionate to the crime committed as to shock "the conscience and reason of men generally."

*State v. Antelope,* 304 N.W.2d 115, 117 (S.D. 1981) (citation omitted).

[¶ 20.] The maximum sentence for first-degree rape of a child less than ten years of age, a Class 1 felony,[2] is life imprisonment. SDCL 22–6–1(3). Peterson was convicted of three Class 1 felonies, for which he received two life sentences and a sentence of 100 years. The maximum sentence for first degree attempted rape of a child less than ten years of age, a Class 2 felony,[3] is 25 years imprisonment. SDCL 22–6–1(4). He was convicted of one Class 2 felony, and sentenced to 25 years.[4] These sentences were not in excess of statutory limits.

> On appeal, we first determine whether the sentence shocks the conscience or is so disproportionate to the crime that it activates the Eighth Amendment within and without jurisdiction proportionality tests. It is settled law in this state that absent a sentence which is so excessive in duration that it shocks the conscience of the court, a sentence that is within statutory limits is not reviewable on appeal. This court has developed a two-fold test to determine whether the sentence is so constitutionally offensive as to shock the conscience:
>
> > First, is the punishment so excessive or so cruel, as to meet the disapproval and condemnation of the conscience and reason of men generally. And second, whether the punishment is so excessive or cruel as to shock the collective conscience of this court.

*State v. Pulfrey,* 1996 SD 54, ¶ 7, 548 N.W.2d 34, 36 (citing *State v. Kaiser,* 526 N.W.2d 722, 726 (S.D.1995) (omitting other citations and quotations)).

[¶ 21.] The first test is whether Peterson's sentence "meets the disapproval and

---

2. *See* SDCL 22–22–1(1) (Supp 1996).

3. *See* SDCL 22–22–1(1) (Supp 1996) & SDCL 22–4–1(5) (providing that "[i]f the attempted crime is punishable by a sentence of life imprisonment . . . the offender convicted of any such attempt

may be punished as if he were guilty of a Class 2 felony").

4. The two life sentences, the 100 year sentence, and the 25 year sentence are to be served concurrently.

condemnation of the conscience and reason of men generally." Peterson presents a federal statute and statutes from neighboring states in an attempt to show the excessive nature of a life sentence for rape.[5]

[¶ 22.] In 1991, the Legislature amended SDCL 22–22–1 to make the rape of a child less than ten years of age a Class 1 felony. Prior to the amendment, that crime was classified as a Class 2 felony. *See* S.D. Laws ch. 24, § 8. "Public intent is reflected in the legislative acts defining the permissible punishment for specific crimes." *Pulfrey*, 1996 SD 54, ¶ 9, 548 N.W.2d at 36; *State v. Ramos*, 1996 SD 37, ¶ 8, 545 N.W.2d 817, 819; *State v. Pack*, 516 N.W.2d 665, 668 (S.D. 1994). An increase in penalty for a crime is within the legislative prerogative. *Ramos*, 1996 SD 37, ¶ 8, 545 N.W.2d at 820.

[¶ 23.] Peterson seems to think because it was his own children he abused, and because he used no "brutality" or "violence," his sentence is too severe. First, we take issue with his assertion he employed no violence or brutality in his crimes. "Violence" is defined, in part, as "exertion of any physi-

cal force so as to injure or abuse." *Webster's Third New Int'l Dictionary* 2554. "Brutal" has as one of its definitions "stemming from or based on crude animal instincts; devoid of mercy or compassion." *Id.* at 286. Peterson's actions were more brutal and violent than he is willing to admit.

[¶ 24.] Next, the fact it was his own children he abused is certainly not a mitigating factor; on the contrary, that he sexually abused his own young daughters is what makes Peterson's crimes especially abhorrent. "The sexual abuse of children by their parental custodian violates the sacred trust that is the parent-child relationship. It distorts in the developing psyche of a child that which we as a society recognize as healthy human sexual behavior." *State v. Basker*, 468 N.W.2d 413, 418 (S.D.1991). Expert testimony at the sentencing hearing demonstrated the bleakness of A.R.P.'s future because of the sexual abuse inflicted by Peterson. She will struggle for years with post-traumatic stress disorder, and she may be both a sexual abuse victim and a sexual abuser in the future.[6] Peterson has failed to

---

5. This court has previously declined to engage in a proportionality analysis in non-capital cases:

It is unclear whether a proportionality test is ever reached by this court. Pulfrey claims comparison of other states' statutes is a factor in considering whether South Dakota statutes allow a punishment that shocks the conscience of men generally. He claims that by considering only the South Dakota statute, this prong of the test becomes meaningless. Given the language of *State v. Pack*, 516 N.W.2d 665, 668 (S.D.1994), which says public intent is " 'reflected in the legislative acts defining the permissible punishment for specific crimes,' " this argument seems sound. The language of Pack is not limited to a survey of South Dakota's legislative acts, and therefore there may be open to consideration of statutes of other states. Disproportionality may simply be a factor for consideration in determining whether the sentence shocks the conscience of this court. *State v. Ramos*, 1996 SD 37, ¶ 7 n.1, 545 N.W.2d 817.

In *Pack*, 516 N.W.2d at 669, this court held the sentence did not shock its conscience and therefore did not reach the proportionality analysis. However, in *State v. Ferguson*, 519 N.W.2d 50, 54 (S.D.1994), this court found Ferguson's sentence did not shock its conscience, but refrained from entering a proportionality discussion because no disproportionality data had been given to the trial court. In *Bult v. Leapley*, 507 N.W.2d 325, 328 (S.D. 1993) (*Bult II*), this court held because the

sentence shocked its conscience, there was no need for proportionality review. "Whether the Eighth Amendment even encompasses a proportionality principle in non-capital cases has been called into question by the United States Supreme Court." *Bult II*, 507 N.W.2d at 328 n.2 (citing *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). We generally agree in view of the fact that proportionality review is a legislative option even in capital cases. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

*Pulfrey*, 1996 SD 54, ¶ 8 & n.1, 548 N.W.2d at 36 & n.1.

6. Psychiatrist Dr. Jessica Oesterheld testified A.R.P. will continue to be at risk because "the prior sexualized behaviors from both parents [have] been put into the fabric of her character." Additionally, she will be prone to multiple personality disorder, borderline personality disorder, and recurrent depression. When a child is sexually abused at such a tender age, permanent chemical and physiological changes may occur:

[W]hen a child ... is eroticized or sexualized early, before a time when it is ... appropriate ... that's very traumatic, and it not only changes their character, but actually ... there are physiological changes to their central nervous system[.]

Oesterheld stated she should be observed for relapses of chronic post-traumatic stress disorder for the remainder of her life.

establish grounds for reversal under this test.

[¶ 25.] The second test is whether the punishment is so excessive or cruel as to shock the collective conscience of this court. In framing an appropriate sentence,

> the sentencing court should acquire a thorough acquaintance with the character and history of the man before it. This study should examine a defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.

*Pulfrey*, 1996 SD 54, ¶ 10, 548 N.W.2d at 37 (citing *State v. Chase in Winter*, 534 N.W.2d 350, 354 (S.D.1995) (other citations omitted)).

[¶ 26.] Peterson was interviewed twice by Detective Bruce Bailey of the Sioux Falls Police Department in July of 1993, shortly after the sexual abuse was discovered in the Peterson home. In those interviews, Peterson admitted to: Engaging in sexual acts with Cheryl in front of the children; masturbating in front of the children; six to eight instances of sexual contact with A.R.P.; touching A.R.P.'s vagina with his fingertips and with a vibrator; performing oral sex on A.R.P.; one instance of sexual contact with A.L.P. where he "rubbed" her vagina with his fingers; and seeking sexual contact and affection from his daughters because he felt rejected by Cheryl.

[¶ 27.] This last admission is in keeping with his attitude of denial, minimization, and projection of responsibility regarding the sexual abuse of his daughters. He blames Cheryl for initiating the sex in front of the children. He denies that he was sexually aroused by A.R.P., but blames her for "crawling on top when I was already doing it (masturbating)." He claims it was A.R.P., not he, who attempted to insert his penis into her vagina. The 1993 psychological evaluation of Peterson prepared in conjunction with the first trial was utilized by the sentencing court. That report indicates he became "loud and defensive" when questioned about

walking around the house nude in front of the children. He accused Cheryl of being the perpetrator of more "activities" than him. When asked how he selected his victims, he replied that it involved "mutual consent by all."

[¶ 28.] Scott Pribyl, the psychologist who conducted the evaluation, testified at the sentencing hearing. In his report, he concluded that Peterson is at a high risk to relapse sexually, and that he could not demonstrate empathy toward his sexual abuse victims. He recommended that Peterson be precluded from having any contact with persons under the age of 18. Pribyl's report closes with this ominous statement: "All persons reading this report should realize that Ralph Peterson will have a high potential to physically or sexually assault others regardless of what form of incarceration or treatment procedures are implemented at this time."

[11] [¶ 29.] The trial court considered all of the above information in sentencing. Peterson argues the trial court erred by not considering rehabilitation, and that "it could not have been determined ... that rehabilitation ... was so unlikely that it should have been removed from consideration in sentencing." This court has stated rehabilitation is a factor which must be ruled out before a life sentence may be imposed. A life sentence should only be imposed when a trial court:

> [C]an determine from the facts of the principal offense and the previous convictions that rehabilitation is so unlikely as to be removed from consideration in sentencing; that the interests of society demand that the convict be kept off the streets for the rest of his life ... and that the life sentence not constitute excessive retribution.

*Pulfrey*, 1996 SD 54, ¶ 18, 548 N.W.2d at 38 (citations omitted).

[¶ 30.] The trial court, prior to sentencing, stated it must consider retribution, deterrence, and rehabilitation. It then noted that rehabilitation must be ruled out if public safety and the facts of the case warrant.

---

A.R.P. sent a message with Oesterheld to be repeated at the sentencing hearing: "I hope he goes to jail for a long time because I don't want

him in the world. He might do bad things. Maybe the same things he did to us again or maybe to someone else."

Before sentence was imposed, the court stated:

> Now, this case involves a case where two children ... were preyed upon by one of the two people in the world they should have been most able to trust for their care and safety; that being their father. Instead; in this case Mr. Peterson became a predator upon those children. Mr. Peterson is here on a third offense, and the psychological reports do not show that there is such a reasonable likelihood of success at treatment that society can· be protected. Mr. Peterson, I am going to impose a life sentence. I do—it is difficult to give a life sentence to anyone, in this case, in the interest of public safety, I don't think there's any sentence—other sentence which reasonably can be given.

[¶ 31.] Whether Peterson could be rehabilitated or not was a fact question for the trial court. *Ramos*, 1996 SD 37, ¶ 19, 545 N.W.2d at 821 (citations omitted). There was expert testimony suggesting he could not be rehabilitated, given his age of 40 and his unwillingness to admit responsibility. There was no testimony to the contrary. The transcript of the sentencing hearing. demonstrates that the trial court contemplated the issue of rehabilitation before sentence was pronounced.

[¶ 32.] In view of all of the above, and all of the circumstances of this case, this sentence does not shock the conscience of this court and we affirm.

[¶ 33.] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

