2003 SD 83

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Dale GUTHMILLER, Defendant and Appellant.**

**No. 22341.**

Supreme Court of South Dakota.

Argued Feb. 11, 2003.

Decided July 16, 2003.

Lawrence E. Long, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, for plaintiff and appellee.

Larry Mamula, Dakota Plains Legal Service, Rapid City, for defendant and appellant.

MEIERHENRY, Justice.

[¶ 1.] A Pennington County jury convicted Dale Guthmiller (Guthmiller) of criminal pedophilia. He was also found to be a habitual offender. The trial court sentenced him to life in prison without parole. Guthmiller appeals his conviction and sentence. We affirm.

## FACTS

[¶ 2.] Guthmiller, also known as Wrench, owned a motorcycle shop called "Wrench's Repair." Guthmiller hired acquaintance M.B. to organize the paperwork for the business. On July 9, 2001, M.B. arrived for her first day of work at approximately 8:30 a.m. She brought her four-year-old daughter R.B. to the shop with her. R.B. liked to play with Guthmiller's cats while her mother worked. Shortly after arriving, Guthmiller and M.B. smoked drugs together.

[¶ 3.] Later that afternoon, between 3:00 p.m. and 4:00 p.m., Don Rice (Rice) came to the shop looking for Guthmiller. M.B. directed him to the back of the shop where she thought Guthmiller was working. Returning from the back of the shop, Rice indicated to M.B. that he had not found Guthmiller. M.B. realized that R.B. was also missing. A few minutes later Guthmiller and R.B. appeared. Guthmiller explained that he had taken R.B. to the bathroom. This was the second time that day he had taken her to the bathroom. R.B. ran to her mother asking to go home. M.B. told R.B. to watch a movie while she finished her work. R.B. fell asleep on the couch.

[¶ 4.] R.B. spent the next day at her grandparent's house. Grandmother overheard R.B. repeatedly say to a playmate, "He won't let me play with the kittens." When R.B.'s grandmother asked her to whom she referred, R.B. replied, "I can't tell you." After grandmother's further urging, R.B. blurted out, "it was Wrench he licked my butt and said it was a secret

and if I told anybody he wouldn't let me play with the kittens."

[¶ 5.] Later that same day R.B. repeated her "secret" to her mother expressing, "yes, Wrench licked my butt." M.B. reported R.B.'s story to the police. On July 11, 2001, an investigator contacted M.B. On July 12, 2001, R.B. was taken to Black Hills Pediatrics for an interview and medical exam.

[¶ 6.] Guthmiller was arrested and charged with criminal pedophilia. A Pennington County jury convicted Guthmiller of the charge. The trial court also found on a Part II Information that Guthmiller was a habitual offender. Guthmiller was subsequently sentenced to life imprisonment without parole. Guthmiller appeals the following issues:

1. **Whether the trial court erred in permitting statements to be admitted under SDCL 19–16–38 as an exception to the hearsay rule.**

2. **Whether the trial court erred in finding R.B. competent to testify.**

3. **Whether the trial court erred in denying Guthmiller's motion for mistrial.**

4. **Whether the trial court erred in denying Guthmiller's motion for a new trial based on new evidence.**

5. **Whether the trial court erred in not dismissing the Part II Habitual Offender Information.**

6. **Whether the trial court erred in preventing Guthmiller from offering testimony relating to various matters.**

7. **Whether the trial court erred in sentencing Guthmiller to life in prison and whether the sentence is cruel and unusual punishment in violation of the United States and South Dakota Constitutions.**

## DECISION

1. **Whether the trial court erred in permitting statements to be admitted under SDCL 19–16–38 as an exception to the hearsay rule.**

2. **Whether the trial court erred in finding R.B. competent to testify.**

[¶ 7.] The four-year-old child victim, R.B., testified at trial. The trial court also allowed R.B.'s statements to a friend and to her grandmother to be presented to the jury. Because issues one and two deal with the issue of R.B.'s competency to testify, we will address them together.

[¶ 8.] When reviewing evidentiary rulings this Court applies an abuse of discretion standard. *State v. Cates,* 2001 SD 99, ¶ 10, 632 N.W.2d 28, 33 (citing *State v. Peterson,* 1996 SD 140, ¶ 8, 557 N.W.2d 389, 391). "We review evidentiary decisions deferentially, reversing only when the court has abused its discretion." *State v. Dillon,* 2001 SD 97, ¶ 24, 632 N.W.2d 37, 47 (citations omitted).

[¶ 9.] Reliable hearsay statements by a child under ten describing acts of sexual contact or rape are admissible under SDCL 19–16–38 which provides:

A statement made by a child under the age of ten, or by a child ten years of age . . . describing any act of sexual contact or rape performed with or on the child by another, . . . not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant . . . in the courts of this state if:

(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or

(b) Is unavailable as a witness.

However, if the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

[¶ 10.] Guthmiller asserts that the trial court erred in finding that R.B. was competent to testify. Guthmiller maintains that because R.B. was not competent to testify, she was unavailable as a witness; and since she was unavailable as a witness, her statements should not have been admitted without corroborating evidence. SDCL 19–16–38.

■■■■ [¶ 11.] The determination of the competency of a witness "is left in the first instance to the discretionary judgment of the trial court, after informing itself by proper examination." *State v. Weisenstein*, 367 N.W.2d 201, 203–04 (S.D.1985) (quoting *State v. Reddington*, 7 S.D. 368, 377, 64 N.W. 170, 172–73 (1895)). There is no arbitrary age which prohibits a child from testifying. *State v. Anderson*, 2000 SD 45, ¶ 24, 608 N.W.2d 644, 653 (citations omitted). In order to be a competent witness, a child must have "sufficient mental capacity to observe, recollect, and communicate, and some sense of moral responsibility...." *Weisenstein*, 367 N.W.2d at 204 (citations omitted). Our preference is to allow the child to testify in order for the jury to evaluate the child's credibility. *Anderson*, 2000 SD 45, ¶ 30, 608 N.W.2d at 654.

■■■ [¶ 12.] The trial court initially determined that R.B. was competent to testify on October 2, 2001, on a motion to dismiss. On November 6, 2001, at another motion hearing, the trial court observed R.B. testify regarding her knowledge of the difference between a truth and a lie and viewed a tape of the interview between the Pennington County investigator and R.B. The court found R.B. competent to testify based on her ability to remember and relate what she saw. At trial, the court again repeated its finding that R.B. was competent to testify. "[A] trial judge is vested with wide discretion in determining competency and on appeal, its ruling is entitled to great weight, as it has had the opportunity to see and hear the child." *Anderson*, 2000 SD 45, ¶ 23, 608 N.W.2d at 653 (citing *State v. Pace*, 301 So.2d 323, 325 (La.1974)).

■■■■ [¶ 13.] The trial court additionally determined that R.B.'s statements bore sufficient indicia of reliability. Because R.B. testified at trial and the statements possessed sufficient indicia of reliability, no corroborating evidence was necessary. *State v. Cates*, 2001 SD 99, ¶ 10, 632 N.W.2d 28, 34.

As witnesses, children are neither inherently reliable nor inherently unreliable. Each child's statement must be evaluated on its own merits. Several factors should be considered when assessing reliability. These include:

(1) the child's age and maturity; (2) the nature and duration of the abuse; (3) the relationship of the child to the offender; (4) the coherence of the statement, bearing in mind that young children may sometimes describe incidents in age appropriate language and in a disorganized manner; (5) the child's capacity to observe, retain, and communicate information; (6) the nature and character of the statement itself, considering the child's developmental limitations in understanding and describing sexual behavior; (7) any motivation of the child to make a false allegation or a false denial; (8) the child's susceptibility to suggestion and the integrity of the situation under which the statement was obtained; and (9) all the circumstances under which the statement was made.

*Id.* at ¶ 11, 632 N.W.2d at 34 (citations omitted). No one factor is dispositive. *Id.* "The unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *State v. Floody,* 481 N.W.2d 242, 251 (S.D. 1992) (quoting *Idaho v. Wright,* 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 656 (1990)). The trial court must look at the totality of the circumstances. *Wright,* 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d 638 (1990).

[¶ 14.] In making its decision, the trial court properly looked at the totality of the circumstances and addressed the factors necessary to determine the reliability of the child's testimony. The trial court entered the following findings of fact and conclusions of law after the November 6, 2001 hearing:

1. The child is able to recall past events in detail and relate them in a coherent manner.

2. The child's description of the defendant's actions contained consistent detail.

3. The child demonstrated knowledge of right and wrong and the difference between truth and falsehood.

4. There is no evidence of any reason for the child to fabricate her story. . . .

5. The child knew the defendant prior to the incident and had no reason to fear him.

6. Because of the child's graphic detail of the incident and her consistency in relating what happened, it is unlikely she made up the story.

7. Because of the child's age it is almost impossible to believe that the child related the story for any reason other than its truth.

8. Considering the time, content and circumstances of the child's statements, this Court concludes that there are sufficient indicia of reliability so that the general purposes of Chapters SDCL 19-9 to 19-18 and the interests of justice will best be served by the admissions of the statements into evidence.

[¶ 15.] Guthmiller has failed to show that the trial court abused its discretion in finding that R.B. was competent to testify and that her statements bore sufficient indicia of reliability and trustworthiness. Also, Guthmiller has failed to show that the trial court abused its discretion in admitting R.B.'s statements to her grandmother and a friend.

3. **Whether the trial court erred in denying Guthmiller's motion for mistrial.**

[¶ 16.] Denial of a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Owens,* 2002 SD 42, ¶ 101, 643 N.W.2d 735, 758 (citing *State v. Winckler,* 260 N.W.2d 356, 368 (S.D.1977)). A trial court has "considerable discretion" in granting or denying a mistrial. *State v. Perovich,* 2001 SD 96, ¶ 23, 632 N.W.2d 12, 17 (citation omitted). "Only when this discretion is clearly abused will this court overturn the trial court's decision." *Id.* (citations omitted). In order to justify a mistrial an actual showing of prejudice must be made. *Anderson,* 2000 SD 45, ¶ 36, 608 N.W.2d at 655.

[¶ 17.] Guthmiller argues that a mistrial should have been granted based upon the court's comments to R.B. in the presence of the jury. When R.B. took the stand the court made the following statements:

I've had a chance to watch [R.B.] testify before and I saw her on the videotape

and the court has ruled that she's competent. That means that she's able to remember stuff and relate what she saw. And [R.B.], we've talked about this before and you indicated that you'd tell just what happened and wouldn't make things up; is that right?

Guthmiller moved for a mistrial on the grounds that the court's comments improperly gave the court's "seal of approval" to R.B.'s testimony and invaded the province of the jury.

[¶ 18.] A trial court is required to make a determination on a child's competency to testify. The statement made by the trial court, when taken in context, was for the purpose of establishing that the child was competent to testify and that the child appreciated the importance of telling the truth. Moreover, the trial court instructed the jury that "as in the case of all other witnesses, you are the sole judges of the credibility of the child who has testified in this case." Guthmiller has failed to show how this brief comment by the judge prior to the child's testimony prejudiced the jury. The jurors were fully able to observe the child and judge her credibility for themselves. The trial court did not abuse its discretion in denying Guthmiller's motion for a mistrial.

### 4. Whether the trial court erred in denying Guthmiller's motion for new trial based on new evidence.

[¶ 19.] The defendant maintains that a new trial should have been granted because of information contained in a letter from the victim's mother. Mother wrote the letter as part of the victim's impact statement to be included in the pre-sentence investigation. The letter was dated February 15, 2002, a month after the jury trial and a few days before the habitual offender trial. In the letter mother said that R.B. was sick of talking about the incident and that R.B. claimed she did not remember but that mother believed that R.B. did remember. The defendant argues that this evidence is exculpatory under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and thus under the *Brady* rule, the defendant should have been provided with this evidence. The *Brady* rule requires the prosecution to disclose material and exculpatory evidence. *Id.* at 87, 83 S.Ct. at 1197. *Brady* is not applicable here because the State was not in possession of the evidence of which Guthmiller complains. *State v. Clabaugh*, 346 N.W.2d 448, 450–51 (S.D.1984). Upon request the State is required to provide the defendant, access to any material in its possession. The defendant acknowledged that there was no indication that the state's attorney had actual knowledge of the letter.

[¶ 20.] Furthermore, Guthmiller has failed to show that there is a "reasonable probability" that the statement would have caused the jury to reach a different verdict. *Fowler v. Weber*, 2000 SD 22, ¶ 17, 607 N.W.2d 252, 256. The child's testimony at trial demonstrated her ability to remember the events. She was also subject to cross examination. Guthmiller's attorney had the opportunity to reveal any discrepancies in her testimony and point them out to the jury. There is no showing that the trial court abused its discretion in denying Guthmiller's motion for a new trial.

### 5. Whether the trial court erred in not dismissing the Part II Habitual Offender Information.

[¶ 21.] The law requires the prosecuting attorney to endorse the names of the witnesses known to him at the time of filing an information. SDCL 23A–6–10. Guthmiller moved to dismiss based on non-endorsement of witnesses on the Part II

Habitual Criminal Information. The trial court denied Guthmiller's motion on the condition that the prosecutor provide the names of the witnesses immediately. On November 19, 2001 the state filed a motion to endorse the names of two witnesses.

[¶ 22.] A similar issue was addressed in *State v. Ganrude*, 499 N.W.2d 608 (S.D.1993). In *Ganrude*, the defendant argued that the trial court abused its discretion when it allowed the late endorsement of witnesses on a Part II Information. *Id.* at 612. Although the defendant had not preserved the issue for appeal, we said that it is within the discretion of the trial judge to allow late endorsement of witnesses. *Id.* at 611 (quoting *State v. White Mountain*, 477 N.W.2d 36, 38 (S.D.1991)). "Although under SDCL 23A–6–10, an information on the principal charge is required to list the witnesses known to the prosecuting attorney, there is no comparable requirement for a habitual offender information in SDCL 22–7–11." [1] *Id.* at 612. Late endorsement was allowed absent bad faith or deliberate withholding in *State v. Huettl*, 379 N.W.2d 298 (S.D.1985). In *Huettl* we said,

> Late endorsement may be allowed at the trial court's discretion. In the absence of some showing that the state's attorney acted in bad faith or abused his position in deliberately withholding the witness' name and that the accused was substantially prejudiced, admission of the testimony will not constitute grounds for reversal.

*Id.* at 303 (internal citations omitted). There is no indication that the prosecution acted in bad faith or deliberately withheld the names of witnesses nor that Guthmiller was prejudiced.

[¶ 23.] Guthmiller has not shown that the trial court abused its discretion in allowing a late endorsement of witnesses on the Part II Information.

### 6. Whether the trial court erred in preventing [Guthmiller] from offering testimony relating to various matters.

[¶ 24.] Guthmiller asserts the trial court abused its discretion on a number of evidentiary rulings. "A trial court's evidentiary rulings are presumed correct and are reviewed under an abuse of discretion standard." *Owens*, 2002 SD 42, ¶ 78, 643 N.W.2d at 755 (citing *State v. Perovich*, 2001 SD 96, ¶ 11, 632 N.W.2d 12, 15).

[¶ 25.] During trial, Guthmiller attempted to offer testimony regarding his relationships and interactions with children. The trial court excluded the evidence based on SDCL 19–12–5 (404(b)) which states in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." The trial court asked defense counsel, "Are you offering that testimony for some other purpose than to show he's nice to little kids and wouldn't do anything bad?" To which defense counsel responded, "Yes, that's essentially it." Since Guthmiller only offered the character trait

---

1. SDCL 22–7–11 states:
   An allegation that a defendant is an habitual criminal must be filed as a separate information at the time of, or before, his or her arraignment. The information must state the times, places and specific crimes alleged to be prior convictions and must be signed by the prosecutor. An official court record under seal or a criminal history together with fingerprints certified by the public official having custody thereof will be sufficient to be admitted in evidence without further foundation to prove the allegation that the defendant is an habitual criminal.

to show that he acted in conformity with it on this occasion, it is not admissible under § 404(b). *State v. Wright*, 1999 SD 50, ¶ 17, 593 N.W.2d 792, 800.

▮ [¶ 26.] Guthmiller argues to this Court that it should have been admitted under SDCL 19–12–4(1)(404(a)) or 19–12–7(405(b)). Guthmiller claims that the evidence was admissible as "[e]vidence of a pertinent trait of his character offered by an accused." SDCL 19–12–4(1) (Rule 404(a)). Guthmiller further contends that the testimony was admissible under SDCL 19–12–7 (405(b)) which allows specific instances of conduct to be used when the character or a trait of character is an essential element of the charge, claim, or defense. Guthmiller did not offer the evidence under either § 404(a) or § 405(b) at trial. The trial court did not have the opportunity to consider the admissibility under either rule. There is no showing that the trial court abused its discretion by not admitting the evidence.

▮ [¶ 27.] Guthmiller also alleges that the trial court erred in not allowing certain evidence directed at attacking the credibility of the mother M.B. Guthmiller claims evidence of M.B.'s desire to have a sexual relationship with him should have been admitted. Guthmiller further contends he should have been allowed to show that M.B. had made false allegations of sexual molestation against another man several years earlier. At trial, when Guthmiller attempted to elicit testimony from the man he claims M.B. had falsely accused, the trial court held it irrelevant. The trial court did allow some questioning concerning an alleged attraction of M.B. to Guthmiller but limited its extent.

▮ [¶ 28.] "Questions of relevance of proffered testimony are committed to the discretion of the trial court. . . ." *State v. Olson*, 408 N.W.2d 748, 752 (S.D.

1987). This Court has held that to use prior allegations of a sexual crime to challenge credibility, the allegation must be demonstrably false. *Dillon*, 2001 SD 97, ¶ 26, 632 N.W.2d at 47 (citing *State v. Sieler*, 397 N.W.2d 89, 92 (S.D.1986)). There is no evidence in the record to show that the alleged accusations against the other man were "demonstrably false" or material to the case. The credibility of M.B. was corroborated by the victim's testimony as well as two other witnesses who verified the victim's statements to her mother. The defendant himself corroborated certain areas of M.B.'s testimony. Likewise, the defendant has failed to show any prejudice resulting from the trial court's decision to exclude the offered testimony. The defendant has the burden of showing prejudicial error. *State v. Bingham*, 1999 SD 76, ¶ 9, 600 N.W.2d 521, 523. The defendant must show that if evidence had been admitted, the jury probably would have returned a different verdict. *Id.*

▮ [¶ 29.] Lastly, Guthmiller argues that the trial court erred in denying his motion in limine to exclude testimony of a conversation between M.B. and Guthmiller on or about July 14, 2001. M.B. confronted Guthmiller about R.B.'s allegations against him. M.B. testified that Guthmiller responded by saying, "he was sorry; if he could apologize to R.B.; and he was going to see a psychiatrist." The defendant argues that conflicting versions of the conversation, his distraught mental state at the time, and his heavy use of methamphetamine days prior to the conversation made admission of the conversation unfairly prejudicial. The trial court denied the motion finding that the conversation was relevant to proving whether the incident with the child had occurred and further found the conversation not unduly or unfairly prejudicial. The process of

balancing the probative value of evidence against the possible prejudicial effect is in the sound discretion of the trial court. *State v. Thomas*, 381 N.W.2d 232, 235 (S.D.1986). Just because evidence is harmful does not mean it was unfairly prejudicial. *State v. Bunger*, 2001 SD 116, ¶ 13, 633 N.W.2d 606, 610. There is no showing that the trial court abused its discretion in allowing the testimony.

### 7. Whether the trial court erred in sentencing Guthmiller to life in prison and whether the sentence is cruel and unusual punishment in violation of the United States and South Dakota Constitutions.

[¶ 30.] The legislature established in 1996 that the crime of pedophilia is punishable as a Class 1 felony with a maximum sentence of life in prison and a mandatory minimum of 25 years. In 1999, the legislature amended the statute enhancing the sentence for a second offense of pedophilia to mandatory life without parole.[2] The statutory punishment imposes 25 years to life for a first offense, and a sentence of life without parole for a second offense.

[¶ 31.] Although this was Guthmiller's first offense for the crime of pedophilia, he received a sentence of life without parole because the state charged him as a habitual criminal. The habitual offender statute SDCL 22–7–7 enhances the sentence to the next more severe felony class.[3] In this case, the next more severe classification is a Class B felony, the punishment for which is a sentence of life in prison without parole.

[¶ 32.] Guthmiller claims that SDCL 22–22–30.1 applies exclusively in dealing with cases involving criminal pedophilia; and since this is his first offense pedophilia, he should not be sentenced as if he were a second offender. Guthmiller argues that the specific enhancement provision of SDCL 22–22–30.1 demonstrates that the legislature made an explicit decision to impose a mandatory life sentence only in cases involving a second offense of criminal pedophilia and that such a legislative directive effectively preempts the application of any other type of habitual offender treatment. Guthmiller argues that by allowing the state to enhance the penalty through the habitual statutes would result in anyone who had a prior felony conviction for any type of offense to be

2. SDCL 22–22–30.1 states:

Criminal pedophilia is any act of sexual penetration accomplished with a victim less than thirteen years of age by any person twenty-six years of age or older under any circumstances not constituting incest as defined in subdivision 22–22–1(6). Criminal pedophilia is a Class 1 felony. If any person is convicted of criminal pedophilia, the court shall impose a minimum sentence of twenty-five years for a first offense. If any person is convicted for a second offense, the court shall impose a sentence of life without parole.

3. SDCL 22–7–7 states:

When a defendant has been convicted of one or two prior felonies under the laws of this state or any other state or the United States, in addition to the principal felony, the sentence for the principal felony shall be enhanced by changing the class of the principal felony to the next class which is more severe. The determination of whether a prior offense is a felony for purposes of this chapter shall be determined by whether it is a felony under the laws of this state or under the laws of the United States at the time of conviction of such prior offense. For the purpose of this section, if the principal felony is not classified it shall be enhanced to the class which has an equal maximum imprisonment. For the purposes of this section, if the maximum imprisonment for the principal felony falls between two classifications, the principal felony shall be enhanced to the class which has the less severe maximum authorized imprisonment.

subject to a mandatory life sentence. He urges that this result cannot be reconciled with the specific legislative directive in SDCL 22–22–30.1 and the last sentence in SDCL 22–7–7 which states that "if the maximum imprisonment for the principal felony falls between two classifications, the principal felony shall be enhanced to the class which has the less severe maximum authorized punishment." He asserts that the statutes are inconsistent and create absurd or unreasonable results. He claims that his sentencing should have been conducted within the classification of a Class 1 felony, which gives the trial court the discretion to consider a sentence of 25 years to life.

[¶ 33.] Guthmiller also challenges the sentence as cruel and unusual under the Eighth Amendment to the United States Constitution, as well as Article VI, Section 23, of the South Dakota Constitution. Guthmiller is 45 years old with no history of sex offenses. His criminal history involves four prior felony drug offense convictions. Even considering the circumstances of the present offense, he argues, the sexual molestation was of short duration, no physical violence or physical injury resulted and there was no evidence of any long occurring pattern of abuse. With no prior history of pedophilia, Guthmiller argues his sentence is cruel and unusual under the United States and South Dakota Constitutions.

[¶ 34.] The state contends that the statute is clear and unambiguous and nothing in the pedophilia statute or habitual criminal statutes indicates mutual exclusivity. Also, the state contends that it is within the legislative province to set criminal penalties and its enactments should be given deference. Further the state urges that Guthmiller's prior drug related offenses are serious because of society's recognition of the threat drugs pose. The

state also points out the reprehensibility of the molestation of the young child regardless of absence of physical violence. The state further argues that Guthmiller was uncooperative with the court service officer and he refused to participate in the sex offender evaluation process. Additionally, Guthmiller failed to accept responsibility and showed no remorse.

[¶ 35.] First of all, we will address the issue of statutory conflict. This Court in *Carroll v. Solem,* found that a specific habitual criminal statute controls over a general habitual criminal statute. 424 N.W.2d 155 (S.D.1988). In *Carroll,* we held that the Driving Under the Influence enhancement statute could not be invoked to enhance the DUI to a felony and additionally enhanced by filing a habitual felony enhancement. *Id.* at 157. Carroll prohibited doubling penalty enhancements. The Carroll court concluded, "that SDCL 32–23–4 is a self-contained, specific habitual criminal statute. Rules of statutory construction require that a statute that is specific and express controls over a more general statute[.]" *Id.* We do not find *Carroll* controlling because there is no doubling of enhancement in the present case.

[¶ 36.] In *State v. Layton,* we approved the application of both the inmate doubling statute and the habitual criminal statute because the statutes serve distinct purposes in the criminal justice system. 337 N.W.2d 809 (S.D.1983). Although Guthmiller does not involve doubling penalty enhancements, the analysis of *Layton* is instructive as to the purpose of the habitual offender statutes.

> The individual who commits felonies while incarcerated exhibits a callous disregard of our penal system, is dangerous to penitentiary personnel, and wreaks havoc with an institution which can exist only through discipline. SDCL 22–6–

5.1, the inmate doubling statute, operates in part to protect the unarmed penitentiary guards who must risk their safety to enforce penitentiary rules. *SDCL 22–7–8, our habitual offender statute, operates to protect society from the individual who, through his continued felonious conduct, exhibits that efforts of rehabilitation have failed.* These two statutes serve distinct purposes, each being a vital concern to our criminal justice system.

*Layton,* 337 N.W.2d at 816 (emphasis added).

[¶ 37.] Presumably in an effort to protect children from sexual predators, the South Dakota Legislature enacted a separate pedophilia statute directed specifically at perpetrators over 26 years of age who rape children age 13 and under. The legislature set the penalty of up to life in prison and mandated a minimum sentence of 25 years for a first offense. A second offense automatically receives a sentence of life without parole. SDCL 22–22–30.1. The habitual offender statutes are designed to protect society from individuals who continue to commit felonies and by doing so have demonstrated that rehabilitation has failed.

[¶ 38.] Guthmiller's argument raises the question of whether the legislature intended to have the habitual criminal statutes enhance a first time pedophilia crime to life in prison without parole or only intended that a second offense receive that punishment. In determining legislative intent, we need to examine the statute itself as well as any similar enactments. *Dahn v. Trownsell,* 1998 SD 36, ¶ 14, 576 N.W.2d 535, 539.

[¶ 39.] The legislature revised the Criminal Code in 1976 updating the Field Code of 1877 and as part of that revision it classified felonies into six classes. The classifications defined the permissible punishments for particular offenses and except for Class 1 felonies set the maximum sentences and generally abolished minimum sentences. Richard D. Casey, Comment, *The 1976 Revision of the South Dakota Criminal Code: Putting the Field Code Out to Pasture,* 22 SD Law Rev 99 (1977). The revision established the habitual offender statutes which enhanced the punishment for repeat offenders. SDCL 22–7–7 provided that a sentence could be enhanced by one classification. SDCL 22–7–8 provided that a sentence could be enhanced up to life imprisonment if a defendant had been convicted of three or more prior felonies, one of which was a crime of violence. Subsequently, the legislature added A and B felony classifications and in 1984 added another habitual offender statute allowing enhancement of two classifications if the defendant had been convicted of three or more felonies none of which were crimes of violence. SDCL 22–7–8.1.

[¶ 40.] Since the 1976 revision, the legislature has amended the criminal code requiring specific mandatory minimum sentences for certain crimes. For example, in the 1980s the legislature added mandatory sentences for certain crimes involving drug manufacturing and distributing with specific enhancements for repeat drug offenders. SDCL Ch. 22–42. In 1992, the legislature mandated a minimum sentence for rape (Class 1 felony) and sexual contact with a child under 10. SDCL 22–22–1.2. The law additionally allowed the sentencing judge to depart from the mandatory sentence if mitigating circumstances allowed. SDCL 22–22–1.4.

[¶ 41.] Under the current scheme, the penalty for a first conviction for pedophilia is twenty-five years to life in prison. SDCL 22–22–30.1. The penalty for a second conviction for pedophilia is life in prison. Additionally, if the defendant has been convicted of prior felonies within the

last 15 years, the state's attorney has the discretion to charge the defendant as a habitual offender. SDCL 22–7–7, 22–7–9. If the defendant is found to be a habitual offender, the penalty is enhanced to life in prison without parole. The statutory scheme does not specify a downward departure if mitigating circumstances exist.

[¶ 42.] Nothing in the language of the statutes themselves or in the criminal statutes taken as a whole leads this Court to conclude that the legislature intended that the mandatory minimum sentence enhancement established in SDCL 22–22–30.1 preempts sentencing enhancement as a habitual criminal in SDCL 22–7–7. Each statute has a distinctive purpose. The habitual offender statute is designed to protect society from individuals who continue to commit felonies. The pedophilia statute is designed to protect children in our society from predators who rape children. The sentencing scheme is a policy decision within the purview of the legislature and will not be disturbed by this Court. *Cf. State v. Stetter,* 513 N.W.2d 87 (S.D.1994).

[¶ 43.] Next, we turn to Guthmiller's claim that his life sentence without parole is cruel and unusual under the Federal and State Constitutions. Under a cruel and unusual analysis a life sentence would need to be grossly disproportionate. *State v. Pugh,* 2002 SD 16, ¶ 19, 640 N.W.2d 79, 85. "[To] assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court." *Id.* (citing *State v. Bonner,* 1998 SD 30, ¶ 17, 577 N.W.2d 575, 580). If the sentence does not appear grossly disproportionate, no further review is necessary. *State v. Hinger,* 1999 SD 91, ¶ 16, 600 N.W.2d 542,

547. If the sentence does appear grossly disproportionate, an intra- and inter-jurisdictional analysis shall be conducted. *Id.* We also consider "the gravity of the offense and the harshness of the penalty;" *Solem v. Helm,* 463 U.S. 277, 292 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983); and other relevant factors, such as the effect this type of offense has on society. *Hinger,* 1999 SD 91, ¶ 16, 600 N.W.2d at 547.

[¶ 44] This Court in *Hinger* found a life sentence grossly disproportionate. Hinger pleaded guilty to first degree rape involving sexual contact with his 7–year–old nephew by penile and digital penetration. *Id.* at ¶ 10. An analysis of the statutory scheme of the child-rape statutes led to the conclusion that the legislature intended the more severe the crime, the harsher the penalty imposed. *Id.* at ¶ 19.

The substantial increase in the maximum penalty for the first degree rape of a child under ten, as well as the imposition of mandatory minimum sentences for a first and subsequent offense reflects the public intent. *State v. Peterson,* 1996 SD 140, ¶ 22, 557 N.W.2d 389, 394. These changes reflect an accelerating concern with protecting children, *Bonner,* 1998 SD 30 at ¶ 28, 577 N.W.2d at 583, and an increasing intolerance for the sexual exploitation of children. *State v. Raymond,* 1997 SD 59, ¶ 33, 563 N.W.2d 823, 829.

In addition, the legislature's establishment of a punishment range of ten years to life imprisonment for the first degree rape of a child under ten, clearly shows its intent that:

the more serious commissions of this crime to deserve sentences at the harsher end of the spectrum. "[I]t is a precept of justice that punishment for the crime should be graduated and proportioned to the offense." *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct.

544, 549, 54 L.Ed. 793, 798. Thus a trial court's sentence ought to be proportionate to the particulars of the offense and the offender. Imposing the maximum possible term where the circumstances of the crime only justify a sentence at a lower range violates legislative intent "to reserve the most severe sanctions for the most serious combinations of the offense and the background of the offender." *People v. Milbourn*, 435 Mich. 630, 461 N.W.2d 1, 17 (1990).

*Id.* at ¶¶ 18–19 (citing *Bonner*, 1998 SD 30 at ¶ 25, 577 N.W.2d at 582). Because this was Hingers first felony and because the criminal sexual contact involved only one victim on two occasions with no other pattern or allegation of sexual abuse and because any escalation of criminal activity was due to Hinger's "alcoholism and not any escalation in criminal sexual behavior," a life sentence appeared to be grossly disproportionate. *Id.* at ¶ 22. The case was remanded for the trial court to determine if Hinger was capable of rehabilitation and whether his behavior "was compulsive or rose to the level of pedophilia." *Id.* at ¶ 24.

[¶ 45.] In contrast, a life sentence for kidnapping and rape was not found to be cruel and unusual in *Pugh*, 2002 SD 16, 640 N.W.2d 79. The facts in *Pugh* involved kidnapping a woman while driving her to retrieve the morning papers for her paper route. Pugh refused to let the woman out of the vehicle and drove around for an hour. Pugh sexually penetrated her, threatened to shoot her, performed cunnilingus on her and a second act of sexual penetration. *Id.* at ¶¶ 3–4. Applying the gross disproportionality test,[4] this Court rejected Pugh's claim.

As for proportionality in this sentence, Pugh's record shows a background of violence against women, escalating over time. His criminal history includes a 1988 aggravated kidnapping conviction in Texas, as well as arrests in South Dakota for simple assault (domestic violence), violation of a protection order, and possession of a firearm by a felon. Thus, the kidnapping and rape of M.H.L. were not isolated incidents, but only the latest in a series of acts, all indicating an unlikely prospect for rehabilitation. Pugh's lack of remorse for his crimes against M.H.L. bodes only worse for his chances of reform. The Legislature sanctioned life imprisonment for particularly egregious conduct such as kidnapping, and the trial court found that Pugh was incorrigibly dangerous to others and incapable of rehabilitation. As we have remarked, "successful challenges to the proportionality of particular sentences [will be] exceedingly rare," for this Court gives great deference to sentencing decisions. *State v. Milk*, 2000 SD 28, ¶ 10, 607 N.W.2d 14, 18. In *Bonner*, we held that if a sentence fails "to suggest gross disproportionality, our review ends." *Bonner* at ¶ 17. We find no inference of gross disproportionality in this sentence.

*Id.* at ¶ 19.

[¶ 46.] As to Guthmiller's claim, we must first determine if the sentence appears grossly disproportionate. First, we consider the conduct involved. According to the four-year-old victims testimony, Guthmiller licked her vaginal area while the two were in the bathroom together. He told the child not to tell and threatened that if she did she would not be able to play with the kittens. The incident affected the child emotionally and physically.

---

4. In *Pugh,* this Court adopted the gross disproportionatily test for state constitutional analysis and abandoned the "shock the conscience" test. *Id.* at ¶ 17.

[¶ 47.] It is significant, however, that Guthmiller's sentence is not just for the present conduct but also for his history of criminal activity. The pre-sentence investigation provided to the trial court revealed a history of criminal arrests and convictions dating back to 1983 beginning with a disorderly conduct conviction. His arrests include simple assault, domestic violence, and failure to appear, all of which were dismissed. In 1989, he was convicted of felony possession of marijuana and sentenced to 24 months in the South Dakota State Penitentiary with six months suspended. In 1990 and 1996 Guthmiller was convicted in federal court of conspiracy to distribute a controlled substance. He reported in his pre-sentence investigation that he had served 27 months in federal prison and received six years of supervised release. While on supervised release, Guthmiller said he had relapsed and reported this to his probation officer. He did an additional five months in federal prison for the violation. While serving the five months, he was charged and convicted of conspiracy to distribute a controlled substance and received 36 months in federal prison and four years of supervised release. He completed his supervised release in 1999. He admitted that he continued to use methamphetamine. The record indicates he had been using methamphetamine several days before and on the day the present crime was committed. Guthmiller has no prior criminal convictions involving sex crimes or pedophilia.

[¶ 48.] Next, we must give utmost deference to the legislature and the sentencing court. The legislature has determined that a sex crime against a child is a serious concern and one which should be punished severely. The maximum penalty for the crime is up to life in prison. The other statutes at play here are the habitual criminal statutes under which Guthmiller was charged as a repeat offender. It was the habitual offender status coupled with the serious crime of pedophilia that caused the severe sentence. The scheme of the habitual criminal statutes allows the penalty of the present felony to be increased. The United States Supreme Court recently upheld the application of California's recidivist statutes in *Ewing v. California,* —— U.S. ——, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003). The Court upheld Ewing's sentence of 25 years to life in prison for the offense of felony grand theft involving the theft of three golf clubs priced at $399 each. *Id.* at 1183. Under the three strikes law, he was also found to have been convicted previously of four serious or violent felonies of burglary and robbery. *Id.* at 1184. The Court found that the sentence was not grossly disproportionate and was not cruel and unusual punishment in violation of the Eighth Amendment's prohibition. *Id.* at 1190. California's recidivist enhancement statutes allow the California trial courts discretion to avoid imposing the penalty by reducing certain felonies to misdemeanors or by vacating allegations of prior "serious" or "violent" convictions. *Id.* at 1183. The trial court did not deviate in Ewing's case and imposed 25 years to life. The Court emphasized that criminal sentencing schemes are policy decisions made by state legislatures as long as a state "has a reasonable basis for believing that dramatically enhanced sentences for habitual felons 'advance[ ] the goals of [its] criminal justice system in any substantial way.'" *Id.* at 1189.

Throughout the States, legislatures enacting three strikes laws made a deliberate policy choice that individuals who have repeatedly engaged in serious or violent criminal behavior, and whose conduct has not been deterred by more conventional approaches to punishment, must be isolated from society in order to protect the public safety. Though three

strikes laws may be relatively new, our tradition of deferring to state legislatures in making and implementing such important policy decisions is longstanding. *Weems,* 217 U.S. at 379, 30 S.Ct. 544, 54 L.Ed. 793; *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *Payne v. Tennessee,* 501 U.S. 808, 824, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Rummel v. Estelle,* 445 U.S. 263, 274, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *Solem,* 463 U.S. at 290, 103 S.Ct. 3001, 77 L.Ed.2d 637; *Harmelin v. Michigan,* 501 U.S. 957, 998, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (KENNEDY, J., concurring in part and concurring in judgment).

Our traditional deference to legislative policy choices finds a corollary in the principle that the Constitution "does not mandate adoption of any one penological theory." *Harmelin,* 501 U.S. at 999[, 111 S.Ct. 2680] (KENNEDY, J., concurring in part and concurring in judgment). A sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation. See 1 W. LaFave & A. Scott, Substantive Criminal Law § 1.5, pp. 30–36 (1986) (explaining theories of punishment). Some or all of these justifications may play a role in a State's sentencing scheme. Selecting the sentencing rationales is generally a policy choice to be made by state legislatures, not federal courts. *Id.* at 1187–88.

[¶ 49.] In the present case, the trial court imposed life in prison without parole. Considering the involved conduct, all the prior criminal conduct, his chronic drug addiction, and giving utmost deference to the legislature and the sentencing court; we conclude that Guthmiller's sentence does not appear grossly disproportionate. Since the sentence fails "to suggest gross disproportionality, our review ends." *Bonner,* 1998 SD 30, ¶ 17, 577 N.W.2d at 580.

[¶ 50.] Guthmiller's conviction and sentence are affirmed.

[¶ 51.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.